RECORD NO. 14-1363

# In the United States Court of Appeals

# For the Fourth Circuit

CYNTHIA JOYCE SLEDGE,

*Plaintiff-Appellant,*

vs.

GRAPHIC PACKAGING INTERNATIONAL, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
For the Middle District of North Carolina at Greensboro

## BRIEF OF PLAINTIFF-APPELLANT

Angela Newell Gray
Gray Newell, LLP
7 Corporate Center Court, Suite B
Greensboro, NC 27408
336-724-0330
*Counsel for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1363        Caption: Cynthia Sledge v. Graphic Packaging Int.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Cynthia Sledge
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Angela Gray _____        Date: _____ April 25, 2014 _____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ____ April 25, 2014 ____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Mason G. Alexander
Fisher & Phillips LLP
227 West Trade Street
Suite 2020
Charlotte, NC  28202
malexander@laborlawyers.com

/s/ Angela Gray _____        _____ April 25, 2014 _____
       (signature)                                    (date)

I

## TABLE OF CONTENTS

TABLE OF AUTHORITIES                                    ii

JURISDICTIONAL STATEMENT                                1

STATEMENT OF ISSUES                                     1

STATEMENT OF CASE                                       1

STATEMENT OF FACTS                                      2

SUMMARY OF ARGUMENT                                    11

ARGUMENT                                               11

    Standard of Review                            11

    Discussion of Issues                          12

CONCLUSION                                             28

REQUEST FOR ORAL ARGUMENT                              29

CERTIFICATE OF COMPLIANCE                              30

CERTIFICATE OF SERVICE                                 31

# TABLE OF AUTHORITIES

*Abels v. Renfro Corp.*, 108 N.C. App. 135, 423 S.E.2d 479 (1992),     16
*aff'd in part, rev'd in part*, 335 N.C. 209, 436 S.E.2d 822 (1993)

*Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166(1992)     21

*Anderson v. G.D.C., Inc.*, 281 F.3d 452, 457 (4th Cir.2002)     11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)     11

*Boumediene v. Bush*, 128 S. Ct. 2229, 2271 (2008)     16

*Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 260,     22
580 S.E.2d 757, 762 (2003)

*Brooks v. Stroh Brewery Co.*, 95 N.C. App. 226, 237, 382 S.E.2d 874,     27
882, *disc. review denied*, 325 N.C. 704, 388 S.E.2d 449 (1989)

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)     11

*Chesapeake Ranch Water Co.v. Bd. of Comm'rs of Calvert County*,     15
401 F.3d 274, 279 (4th Cir. 2005)

*Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175,     20
381 S.E.2d 445, 447 (1989)

*Cont'l Airlines, Inc. V. United Airlines, Inc.*, 277 F.3d 499,     11
508 (4th Cir. 2002)

*Edell & Assocs. v. Law Offices of Peter G. Angelos*, 264 F.3d 424,     20
436 (4th Cir. 2001).

*Henderson vs. Traditional Log Homes, Inc.*, 70 N.C. App. 303,     17
319 S.E.2d 290 (1984)

*Lilly vs. Mastec  N. Am., Inc.*, 302 F. Supp. 2d 471, 481 (M.D.N.C. 2004)     15

*McDonnell Douglas Corp. vs. Green*, 411 U.S. 792, 93 S.Ct. 1817,     20
36 L.Ed.2d 668 (1973)

*Morgan v. Musselwhite*, 101 N.C. App. 390, 399 S.E.2d 151 (1991)     17

*Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 331 (4th Cir.2003)     11

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148-     25
49, 147 L. Ed. 2d 105, 120-21 (2000).

*Rubin v. United States*, 449 U.S. 424, 430 (1981)     16

*Salter v. E & J Healthcare*, *Inc.*, 155 N.C. App. 685, 693,     14
575 S.E.2d 46, 51 (2003)

*Sides v. Duke Univ.*, 74 N.C. App. 331, 342, 328 S.E.2d 818, 826 (1985)     20

*Tarrant v. Freeway Foods of Greensboro, Inc.*, 163 N.C. App. 504,     22
509, 593 S.E.2d 808, 812 (2004)

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)     27

*United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993)     16

*U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345,     15
350 (4th Cir. 2004)

*White vs. Curtis Cochran*, —— N.C.App. ——, 716 S.E.2d 420 (2011)     21

*Whitings v. Wolfson Casing Corp.*, 173 N.C. App. 218, 222,     22
618 S.E.2d 750, 753 (2005) (citation omitted)

*Wiley v. UPS, Inc.*, 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004)     18

*Woodson v. Rowland*, 329 N.C. 330, 338, 407 S.E.2d 222, 227 (1991)     16

OTHER AUTHORITY

NCGS §95-241     12

NCGS §95-243     18

IV

NCGS §97-6.1                                                           16

## JURISDICTIONAL STATEMENT

Jurisdiction of the District Court was invoked pursuant to 28 USC §1332 since the parties are of diverse citizenship.  The District Court entered its final order disposing of all of the Plaintiff's claims on March 19, 2014. The Plaintiff-Appellant filed Notice of Appeal from that order on April 14, 2014. This court's jurisdiction is based upon Rule 4 of the Federal Rules of Appellate Procedure, this being an appeal from a final order of the District Court.

## STATEMENT OF ISSUES

Whether the District Court erred by granting the Defendant's Motion for Summary Judgment as to the Plaintiff's claims for Wrongful Termination in violation of N.C.G.S. §95-241 and in violation of the public policy of the state of North Carolina.

## STATEMENT OF CASE

The Plaintiff filed her lawsuit based on claims of the violation of NCGS §95-241 and in violation of the public policy of the state of North Carolina after she was terminated from her position with the Defendant Company in April, 2012. The Plaintiff contends that she was terminated because she provided information regarding, and/or filed, a workers' compensation claim after being injured on the job on March 31, 2012. After discovery concluded, the Defendant Company filed a

Motion for Summary Judgment as to all of the Plaintiff's claims. The District Court granted the Defendant's Motion for Summary Judgment on March 19, 2014.

<u>STATEMENT OF FACTS</u>

The plaintiff began working as a Die Cut Operator with Defendant Graphic Packaging on approximately March 31, 2006. She later worked as a Sheeter Operator beginning in July, 2007. The sheeter machine the plaintiff used was extremely large; over fifty (50) feet long and six (6) to ten (10) feet high. (J.A.p. 112, 118). On March 31, 2012 at approximately 12:00am (midnight), the plaintiff injured her hand when it was accidentally trapped between two (2) rollers while she was operating the sheet feeder. That particular night, the plaintiff was working on a label for a Cool Whip container. The project was new and it was her first time running the paper upside down with the assistance of a new flipper. She had never had any training on using the new flipper. Normally, the plaintiff would have used the forklift and/or clamp truck. They were also using a 12 point board paper that night, rather than the usual 60lb paper. (J.A.p. 112-113, 280). Alan McNeil, Sledge's co-worker, testified that you could put your hand on 60lb. paper and it would kind of just slide, but on the 12 point, your hand sticks and pulls. (J.A.p. 280).

The paper had a lot of curl at the end of the roll so the plaintiff had to run the paper differently than other paper. She tapped or touched the paper with her hand

3

to feel the tension of the paper, and that is when her hand was pulled into the roller. The plaintiff never reached her hand into the machine for any reason. Rather, she merely tapped the end of the paper. This was a technique she had been taught to use to perform the job. In fact, McNeil had trained her to pull paper out of the machine while it was moving to avoid a jam. There was no formal training on the machine. All training was hands on and differed from person to person depending on who was doing the training. All of the sheeter operators tapped or touched the paper to check its tension. There was nothing unusual, nor was it a violation of the Safety Absolute to tap or touch the paper that way. (J.A.p. 113; J.A.p. 271). McNeil, who has been employed as the Lead Sheet Operator for CGI since approximately March 2012, admits that there is no formal training for the sheeter operator. (J.A.p. 256, 258). McNeil also admits that Sledge did not tell him she reached her hand into moving equipment. (J.A.p. 273-274). Further, McNeil agreed that it would not make sense for a person with experience working on the machine to just stick their hand in the roller, especially Sledge. (J.A.p. 277, 279).

At the time the accident occurred, there was no safety guard on the plaintiff's machine.  Prior to the plaintiff's accident, other employees of the company had expressed concerns about the lack of a guard or other safety equipment on the machine. (J.A.p. 114). In addition, employees had been working many hours without days off. Sledge testified that at the time of her accident, she

had been working almost every day since January 2, 2012 from 7:00pm to 7:00am. In fact, McNeil worked twelve (12) hours, every day, for seventy (70) days consecutively. (J.A.p. 267).

Immediately after the accident, the plaintiff informed safety team member, Carolyn White. White then contacted the Plant Manager, Cynthia Wyatt. Ms. White immediately took the plaintiff to the hospital. At the hospital, the plaintiff was prescribed medication and work restrictions. The doctor wanted her to work with only one hand, but informed her that she could return to work. (J.A.p. 113).

The plaintiff returned to work approximately four (4) hours after the accident, but was not given a chance to work. Upon returning to work, Dan Grannan, the Printing Manager and Head of the plaintiff's department, confronted her about the accident. She discussed her plans of filing a workers' compensation claim with Grannan. After telling Grannan how the accident occurred, he indicated that the accident would be investigated and that they would probably put a guard on the area of the machine where the plaintiff was injured. Thereafter, Grannan sent the plaintiff home and told her to take the remainder of the work day and Sunday off. (J.A.p. 114).

Grannan never took any photographs of the machine the plaintiff was injured on in her presence. She explained the accident, but he did not take notes of what she told him in her presence. The plaintiff never told Grannan nor showed him that

5

she had reached into the machine at any time when the accident occurred. The plaintiff explained to Grannan that she "tapped" or touched the paper and her hand was pulled into the machine. (J.A.p. 114).

The plaintiff returned to work on Monday, April 2, 2012 but was taken off of the work floor, and called into the human resources department to answer questions about the accident. During that meeting with Phillip Tacy, who was the Human Resources Manager, Mr. Tacy completed an accident report and said they were investigating her accident. It was also during this meeting that the plaintiff asked more questions about workers' compensation and how her doctor's appointments would be paid for and whether she would receive pay for the days she could not work. Mr. Tacy responded by telling her to go home. (J.A.p. 114).

The plaintiff called Mr. Grannan the next day, but he indicated that they were continuing to investigate the accident and would contact her when they were done. Then, on April 9, 2012, Cynthia Wyatt called the plaintiff at home and informed her that she was terminated for violating a "Safety Absolute". (J.A. p. 87). The plaintiff had been trained on the topic of "Safety Absolute" during the time she worked for GPI. (J.A.p. 72-73). Generally, the safety absolute policies were intended to address "intentional" unsafe conduct. The policy essentially states that you cannot reach ***into*** moving equipment; however, the plaintiff never reached into the machine at any point on the day of her injury. (J.A.p. 73-74, 83, 114).

6

Dan Grannan has been employed since October 2008 as the Technical Processes Manager for GPI. (J.A.p. 128-129). He was the plaintiff's manager but not her immediate supervisor. He had no responsibility for training her. (J.A.p. 129-130). Grannan learned of the plaintiff's injury shortly before midnight on March 31, 2012. Grannan was advised that the plaintiff had smashed her hand and was being taken to the hospital. (J.A.p. 137). Grannan did not see the plaintiff use the machine improperly at the time of the injury (J.A.p. 133), but was aware that the plaintiff was injured while using a machine that she worked on every day. (J.A.p. 131, 165). On the night the plaintiff was injured, there was no supervisor in her department. (J.A.p. 139). No one was on the job that night that the plaintiff could have talked to discuss any problems with the equipment. (J.A.p. 140).

Grannan testified that the material used the night of the plaintiff's injury was a newer material at the facility. Yet, he explained that the plaintiff would not have gotten training on that particular material. (J.A.p. 147, 182, 195). Because of the lack of formal training, Grannan admitted that one operator may perform the operation one way and another operator may perform the operation another way. (J.A.p. 194).

Grannan did not think the plaintiff could work the next day because of her injury. (J.A.p. 165-166). He told the plaintiff not to come back to work because there needed to be further accident investigation. (J.A.p. 167-169). Wyatt agreed

that the plaintiff should not return to work on the day after the incident. (J.A.p. 186, 188).

After talking with the plaintiff, Grannan prepared an investigative report and shared it with Wyatt and Tacy. (J.A.p. 135, 189, 203). Grannan also talked to Wyatt about Sledge's injury, and emailed Wyatt photos he had taken of himself re-enacting the injury. (J.A.p. 187). Grannan took a photo of his own hand at the assumed point on the machine where the plaintiff was injured, but never took a picture of the plaintiff's hand re-enacting the injury, even though he said she walked him through what happened at the plant when she returned from the hospital at 4:00am that night.

J.A.p. 161 (Grannan Deposition)

10    Q    Did you ever take a photo of Cynthia showing

11    you where her fingers were on the machine?

12    A    No, ma'am.

13    Q    Why didn't you just take - why didn't you

14    just ask Cynthia to show you physically where her hand

15    was at the time this accident occurred and then take a

16    photo of Cynthia's hand on the machine?  Why didn't

17    you do that?

18    A    I don't know why, ma'am.

19    Q   I mean, doesn't that seem - does that seem

20  logical to you to have done that?  If she's standing

21  there with you showing you where she had her fingers,

22  why wouldn't you just take a picture of her hand?

23    A   Most likely because it was bandaged and she

24  had it elevated.

25    Q   And she has two hands, though, right?

                    J.A.p. 162

1    A   Yes, ma'am.

2    Q   And she could have still pointed to it or

3  indicated where she was - her fingers were, couldn't

4  she?

5    A   I believe so, yes, ma'am.

6    Q   I mean she was physically able to come back

7  to the office that night, right?

8    A   Yes, ma'am.

9    Q   Did you show Cynthia these other photographs

10  that you had taken?

11    A   Personally, no, ma'am.

12    Q   For example, where you - on page 84, which

13  is 84 at the bottom where you say, "Smudge may

14  indicate area of contact," did you ever just show that

15  photo to Cynthia and ask her, "Was that the area of

16  contact"?

17      A   I don't believe I did, ma'am.

Grannan testified that the plaintiff told him she touched the paper, but never said she stuck her fingers into the roller. (J.A.p. 181). Grannan further admitted that he changed the condition of the equipment from the time he got to the plant the night of the injury to the time he took the photo. (J.A.p. 163).

Tara Partridge has been the Claims Manager for GPI since March 2006. (J.A.p. 210). She learned of the plaintiff's injury and workers' compensation claim in April 2012 when the Greensboro facility reported it to her. According to Partridge, the facility reported that the plaintiff's hand had been "pulled" in between two rollers, and she suffered a "traumatic" injury. (J.A.p. 214, 223). Partridge further admits that there was no indication that the plaintiff had intentionally put her hand into the rollers. (J.A.p. 214, 223).

Partridge communicated with Phillip Tacy, Human Resources Manager, as part of the investigation into the injury and they discussed the status of the plaintiff's workers' compensation claim with the insurance claims adjuster. (J.A.p. 224-226).

After the injury, Partridge understood that the plaintiff was allowed to return to work with the restriction of working with one arm only. (J.A.p. 228). It was also her understanding that the plaintiff's benefits for lost time were not paid because they had a light duty position available for her which would accommodate her one arm work restriction. However, once the plaintiff was terminated, no workers' compensation benefits were paid. (J.A.p. 241-242).

Partridge confirmed that if the plaintiff's workers' compensation claim had been accepted, the employer would have been responsible for paying all of the plaintiff's medical care and treatment, as well as her lost wages for missed work. (J.A.p. 228, 230-231).

Ultimately, the plaintiff was terminated based on the investigative report of Grannan wherein he indicated she violated a Safety Absolute. Wyatt and Tacy, who were on the senior management team, concurred with Grannan and terminated the plaintiff. (J.A.p. 182-185).

## SUMMARY OF ARGUMENT

The District Court erred in granting the Defendant's Motion for Summary Judgment because it applied the incorrect proof scheme to the Plaintiff's claim under NCGS §95-241. The District Court also erred in granting the Defendant's

Motion for Summary Judgment since there was a genuine dispute as to the reason for the Plaintiff's termination.

ARGUMENT

STANDARD OF REVIEW

This court must review the District Court's grant of summary judgment *de novo*, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the Plaintiff. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). *Cont'l Airlines, Inc. V. United Airlines, Inc*., 277 F.3d 499, 508 (4th Cir. 2002). In such a review, the Circuit Court must determine whether there is a genuine dispute regarding any material facts. *Id*. A grant of summary judgment is improper if such a dispute exists. *Id*. All evidence must be viewed in the light most favorable to the nonmovant, and "…without weighing the evidence or assessing the witnesses' credibility." *Ocheltree v. Scollon Prod., Inc*., 335 F.3d 325, 331 (4th Cir.2003) (*quoting Anderson v. G.D.C., Inc*., 281 F.3d 452, 457 (4th Cir.2002)). Judgment as a matter of law is proper only if "there can be but one reasonable conclusion as to the verdict." *Id*. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

12

## ISSUES

I.     <u>THE DISTRICT COURT ERRED BY GRANTING THE
       DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO
       THE PLAINTIFF'S CLAIM FOR WRONGFUL TERMINATION IN
       VIOLATION OF NCGS §95-241 WHEN IT APPLIED THE
       INCORRECT PROOF SCHEME</u>

The Retaliatory Employment Discrimination Act, often referred to as

"REDA", NCGS § 95-241, states in pertinent part:

(a) No person shall discriminate or take any retaliatory action against an

employee because the employee in good faith does or threatens to do any

of the following:

(1) File a claim or complaint, initiate any inquiry, investigation,

inspection, proceeding or other action, or testify or provide

information to any person with respect to any of the following:

a.   Chapter 97 of the General Statutes.

b.   Article 2A or Article 16 of this Chapter.

c.   Article 2A of Chapter 74 of the General Statutes.

d.   G.S. 95-28.1.

e.   Article 16 of Chapter 127A of the General Statutes.

f.   G.S. 95-28.1A.

(2) Cause any of the activities listed in subdivision (1) of this subsection

to be initiated on an employee's behalf.

(3) Exercise any right on behalf of the employee or any other employee afforded by Article 2A or Article 16 of this Chapter or by Article 2A of Chapter 74 of the General Statutes.

(4) Comply with the provisions of Article 27 of Chapter 7B of the General Statutes.

(5) Exercise rights under Chapter 50B. Actions brought under this subdivision shall be in accordance with the provisions of G.S. 50B-5.5.

(b) It shall not be a violation of this Article for a person to discharge or take any other unfavorable action with respect to an employee who has engaged in protected activity as set forth under this Article if the person proves by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee. (1991 (Reg. Sess., 1992), c. 1021, s. 1; 1993, c. 423, s. 1; 1997-153, s. 7; 1997-350, s. 3; 1998-202, s. 7; 1999-423, s. 4; 2004-186, s. 18.2.)

In order to state a claim under REDA, a plaintiff must show that:

(1) she exercised her rights as listed under N.C. Gen. Stat. § 95-241(a),

(2) she suffered an adverse employment action, and

(3) the alleged retaliatory action was taken because the employee exercised

her rights under N.C. Gen. Stat. § 95-241(a).

*Salter v. E & J Healthcare*, *Inc*., 155 N.C. App. 685, 693, 575 S.E.2d 46, 51

(2003). An adverse action includes "the discharge, suspension, demotion,

retaliatory relocation of an employee, or other adverse employment action taken

against an employee in the terms, conditions, privileges, and benefits of

employment." N.C. Gen. Stat. § 95-240(2) (2003). If the plaintiff presents a *prima*

*facie* case of retaliatory discrimination, then the burden shifts to the defendant to

prove by the greater weight of the evidence that it "would have taken the same

unfavorable action in the absence of the protected activity of the employee." N.C.

Gen. Stat. § 95-241(b) (2003).

In the present case, the District Court applied the incorrect burden shifting

scheme to the facts based on the statutory authority of NCGS §95-241. In its

opinion, the District Court stated that the plaintiff must first establish that 1) she

exercised her right to engage in protected activity; 2) she suffered an adverse

employment action; and 3) a causal connection exists between the exercise of the

protected activity and the alleged retaliatory action. The court goes on to state that

once the plaintiff establishes a prima facie case of retaliatory discharge, the burden

then shifts to the Defendant to show, by a preponderance of the evidence, that it

would have taken the same unfavorable action in the absence of the protected

activity of the employees. The court then erroneously concluded, relying on the

precedential authority of *Lilly vs. Mastec  N. Am., Inc.*, 302 F. Supp. 2d 471, 481

(M.D.N.C. 2004) (Eliason M.J.), that the burden then shifts back to the plaintiff to

show pretext. (J.A. p. 292). We contend that the burden shifting scheme articulated

in *Lilly* should not be applied to causes of action under NCGS §95-241 for the

reasons set forth below.

First, NCGS §95-241 is clear in its language regarding burden of proof. It

states unequivocally, "It shall not be a violation of this Article for a person to

discharge or take any other unfavorable action with respect to an employee who

has engaged in protected activity as set forth under this Article *if the person proves*

*by the greater weight of the evidence that it would have taken the same*

*unfavorable action in the absence of the protected activity of the employee*." (1991

(Reg. Sess., 1992), c. 1021, s. 1; 1993, c. 423, s. 1; 1997-153, s. 7; 1997-350, s. 3;

1998-202, s. 7; 1999-423, s. 4; 2004-186, s. 18.2.).

When interpreting any statute, the Court must first and foremost strive to

implement congressional intent by examining the plain language of the statute".

*Chesapeake Ranch Water Co.v. Bd. of Comm'rs of Calvert County*, 401 F.3d 274,

279 (4th Cir. 2005) ("As in all cases of statutory interpretation, our inquiry begins

with the text of the statute"); *U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d

345, 350 (4th Cir. 2004) ("When interpreting statutes we start with the plain

16

language"); *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993) ("The proper

interpretation of [a statute] must begin with the plain language of the statute, and

absent ambiguity or a clearly expressed legislative intent to the contrary, the statute

must be given its plain meaning"); see also *Boumediene v. Bush*, 128 S. Ct. 2229,

2271 (2008) ("The canon of constitutional avoidance does not supplant traditional

modes of statutory interpretation. We cannot ignore the text and purpose of

a statute in order to save it"). It is an axiom of statutory interpretation that the plain

meaning of an unambiguous statute governs, barring exceptional circumstances.

*See, e.g., Rubin v. United States*, 449 U.S. 424, 430 (1981).

The North Carolina Court of Appeals has also held that statutes should be

interpreted to ensure that the purpose of the legislature is accomplished. *Woodson*

*v. Rowland*, 329 N.C. 330, 338, 407 S.E.2d 222, 227 (1991). "REDA" replaced

NCGS§ 97-6.1, the purpose of which was to promote an open environment in

which employees could pursue remedies under the Workers' Compensation Act

without fear of retaliation from their employers. *Abels v. Renfro Corp*., 108 N.C.

App. 135, 423 S.E.2d 479 (1992), *aff'd in part, rev'd in part*, 335 N.C. 209, 436

S.E.2d 822 (1993). Prior to being repealed in 1992, N.C.Gen. Stat. § 97-6.1(a)

protected employees only against discharge and demotion. In a claim brought

pursuant to the former provision, section 97-6.1(a), the North Carolina Court of

Appeals stated that an employee bears the burden of proof in retaliatory discharge

actions. *Morgan v. Musselwhite*, 101 N.C. App. 390, 399 S.E.2d 151 (1991). In

*Henderson vs. Traditional Log Homes, Inc*., 70 N.C. App. 303, 319 S.E.2d 290

(1984), the ability of an employer to chill an employee's exercise of his rights

under the Worker's Compensation Act through retaliatory discharge or demotion

motivated our legislature to enact G.S. §97-6.1 which provides in pertinent part:

(a) No employer may discharge or demote any employee because the employee has

instituted or caused to be instituted, in good faith, any proceeding under the North

Carolina Workers' Compensation Act, or has testified or is about to testify in any

such proceeding.

By enacting REDA, however, the General Assembly expanded the definition

of retaliation to include "the discharge, suspension, demotion, retaliatory relocation

of an employee, or other adverse employment action taken against an employee in

the terms, conditions, privileges, and benefits of employment." N.C. Gen. Stat. §

95-240(2) (1999).

In addition under the former statute, 97-6.1(b) states that any employer who

violates any provision of this section shall be liable in a civil action for reasonable

damages suffered by an employee as a result of the violation, and an employee

discharged or demoted in violation of this section shall be entitled to be reinstated

to his former position. The burden of proof shall be upon the employee.

A cause of action under this section lies only if an employee is discharged or demoted because he exercised his rights under the Worker's Compensation Act. Plaintiff has the burden of proof on the claim of retaliatory discharge or demotion.

However, under the new provision in N.C. Gen. Stat. § 95-241(b), the legislature specifically provided, "If plaintiff presents a prima facie case of retaliatory discrimination, then the burden shifts to the defendant to prove, by a preponderance of the evidence, that it 'would have taken the same unfavorable action in the absence of the protected activity of the employee.'" *Wiley v. UPS, Inc.*, 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004) (citation omitted)(quoting N.C. Gen. Stat. § 95-241(b)). Thus, under the new statute, both parties have a burden of proof. Case law is clear that the party with the burden of proof at trial will rarely be entitled to summary judgment.

The legislature also revised the damages under the new statute that are different from both the former statute, NCGS §97-6.1 and the common law cause of action associated with violations of public policy. For example, a prevailing plaintiff under the statutory violation of NCGS §95-243(c), may seek and the court may award any or all of the following types of relief:

(1)     An injunction to enjoin continued violation of this Article.

(2)     Reinstatement of the employee to the same position held before the retaliatory action or discrimination or to an equivalent position.

19

(3)      Reinstatement of full fringe benefits and seniority rights.

(4)      Compensation for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or discrimination.

(5)      Treble Damages for willful violations

(6)      Reasonable Costs and Expenses, including Attorney's Fees

Whereas, under the common law public policy violation, a plaintiff may seek and the court may award damages only for mental anguish, backpay and punitive damages.

Finally, neither this Court, the North Carolina Supreme Court nor the North Carolina Court of Appeals has interpreted the burden shifting scheme to require the plaintiff to show pretext as relied upon by the District Court in the present case. Although *Wiley* was affirmed by this court, the opinion was unpublished and therefore is not binding. No other North Carolina opinion has specifically addressed the issue of the burden shifting scheme under NCGS §95-241. In spite of the District Court's recognition that the North Carolina Court of Appeals has set forth a legal standard for evaluating REDA claims which shifts the burden to the employer to prove by a preponderance evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee, it nonetheless applied the *McDonnell Douglas* burden shifting scheme to the facts in

20

*Wiley*. *McDonnell Douglas Corp. vs. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Summary Judgment is appropriate only where there is no genuine issue of material and the moving party is entitled to judgment as a matter of law. *Edell & Assocs. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 436 (4th Cir. 2001). NCGS §95-241 clearly establishes a burden of proof, not just for the plaintiff-employee, but also for the defendant-employer. Unlike a Title VII claim, a defendant's mere articulation of a reason for the plaintiff's termination is insufficient to shift the burden of proof back to the plaintiff.

Based on the foregoing, we contend that the District Court applied the incorrect proof scheme to the present facts. The District found that the Plaintiff met her burden of proof under NCGS §95-241, therefore summary judgment should have been denied.

II.     THE TRIAL COURT ERRED BY GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR WRONGFUL TERMINATION IN VIOLATION OF THE PUBLIC POLICY OF NORTH CAROLINA, NAMELY NCGS §§95-241 AND 97.

The North Carolina Supreme Court recognized an exception to the employment at will doctrine in *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989) (quoting *Sides v. Duke Univ.*, 74 N.C. App. 331, 342,

328 S.E.2d 818, 826 (1985)): "[W]hile there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent." In *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992), the North Carolina Supreme Court clarified that "at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes."

In *Rebecca White vs. Curtis Cochran*, ⸺ N.C.App. ⸺, 716 S.E.2d 420 (2011), the plaintiff sued the Sheriff of Swain County. The Court of Appeals held that the complaint alleged both a violation of REDA *and* a common law claim for wrongful discharge in violation of public policy. There, the complaint specifically asserted that Ms. White "was discharged from her employment with the Defendant in violation of the state public policy set out in N.C.G.S. § 95-241(a)(1)a." The complaint further stated that "[a]s a direct and proximate result of the Defendant's violation of state statutory law and the wrongful discharge of the Plaintiff, the Plaintiff has incurred substantial damages including lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action of the Defendant." Moreover, the complaint confirmed the intent to assert two separate

22

causes of action by seeking both punitive damages and treble damages pursuant to

N.C. Gen. Stat. § 95-243 for willful violation of N.C. Gen. Stat. § 95-241.

The plaintiff here makes similar assertions in the complaint in ¶¶ 5, 18-23,

Count One and in her prayer for relief. (J.A. 13-23). Therefore, she asserted both a

"REDA" violation and a common law, wrongful termination claim.

The appellate courts have previously held that a plaintiff may pursue both a

statutory claim under REDA and a common law wrongful discharge claim based

on a violation of REDA. In *Whitings v. Wolfson Casing Corp.*, 173 N.C. App. 218,

222, 618 S.E.2d 750, 753 (2005), the court held that "[b]oth the Workers'

Compensation Act and the Retaliatory Employment Discrimination Act (REDA)

are sources of policy establishing an employee's legally protected right of pursuing

a workers' compensation claim. An action pursuant to REDA is a supplemental

remedy to the common law claim of wrongful discharge." *See also Tarrant v.*

*Freeway Foods of Greensboro, Inc.*, 163 N.C. App. 504, 509, 593 S.E.2d 808, 812

(2004) ("In this case, plaintiff has alleged sufficient facts to survive a motion to

dismiss on the claim of wrongful discharge in violation of public policy. Plaintiff

claims that she was fired because she asserted her rights under the Workers'

Compensation Act."); *Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 260, 580

S.E.2d 757, 762 (2003) ("[A] plaintiff may state a claim for wrongful discharge in

23

violation of public policy where he or she alleges the dismissal resulted from an assertion of rights under the Workers' Compensation).

Under the common law scheme, if the plaintiff presents a prima facie case of retaliatory discrimination, then the burden shifts to the defendant to show that he would have taken the same unfavorable action in the absence of the protected activity of the employee. Although evidence of retaliation in a case may often be completely circumstantial, the causal nexus between protected activity and retaliatory discharge must be something more than speculation. *Wiley* at 186-87, 594 S.E.2d at 811 (citations and quotation marks omitted). *Salter v. E & J Healthcare, Inc.*, 155 N.C. App. 685, 691, 575 S.E.2d 46, 50 (2003) (citation and quotation marks omitted). In the present case, the District Court concluded that the Plaintiff met her burden of showing a causal connection between the protected activity and the retaliatory discharge. (J.A. p. 293).

Notwithstanding, here, the District Court concluded that the Plaintiff failed to offer evidence for a reasonable fact finder to conclude that Defendant's proffered reasons for Plaintiff's termination amounted to pretext.  (J.A. p. 292, 293). We disagree that the plaintiff had such a burden and we disagree that the plaintiff failed to offer sufficient evidence to withstand summary judgment.

The facts show that Wyatt admitted in her affidavit that violation of a Safety Absolute would result in termination ***unless extraordinary circumstances exist***.

24

(J.A.p. 34). In the present case, assuming *arguendo* Sledge violated a Safety Absolute, she has forecast ample evidence that extraordinary circumstances existed. First of all, she was using a different type of paper which had the tendency to "grab" your hand. Next, she was operating the flipper for the first time with no training. That is significant because the flipper set the paper in a way that was different from the norm. Lastly, there were no witnesses to state that the plaintiff reached into moving equipment on the night of the accident, and the plaintiff vehemently denies intentionally reaching into moving equipment.

"In enacting REDA and its predecessor statute, N.C. Gen. Stat.§ 97-6.1 [(2011)], the General Assembly intended to prevent employer retaliation from having a chilling effect upon an employee's exercise of his or her statutory rights under the Worker's Compensation Act." *Whitings v. Wolfson Casing Corp.*, 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005) (citation omitted). *Wiley v. UPS, Inc.*, 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004) (citation omitted). The District Court's opinion in this case is a perfect example of why an employee would not want to exercise his or her statutory rights under the Workers' Compensation Act. It is undisputed that the plaintiff's injury was the result of an accident. Yet, because of the employer's "Safety Absolute" policy, her accident has been construed as being "intentional" thereby failing within the policy. The facts clearly show that genuine issues abound regarding the reason for the

25

plaintiff's termination. It is the factfinder's role to determine those issues, not the

District Court's. In fact, the District Court's ruling in this case sets a dangerous

precedence that is contrary to what the legislature intended by enacting NCGS

§95-241. Clearly an injured employee would be hesitant to report an accidental

injury if in so doing the employer could interpret and mislabel accidental conduct

as intentional conduct.

In determining the suitability of summary judgment in this type of case, our

United States Supreme Court has stated the following:

> Whether judgment as a matter of law is
> appropriate in any particular case will
> depend on a number of factors. Those
> include the strength of the plaintiff's
> prima facie case, the probative value of the
> proof that the employer's explanation is
> false, and any other evidence that supports
> the employer's case and that properly may be
> considered on a motion for judgment as a
> matter of law.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148-

49, 147 L. Ed. 2d 105, 120-21 (2000). In discrimination cases where motive and

intent are critical to the analysis, summary judgment may only be appropriate if the

non-moving party rests merely upon conclusory allegations, improbable inferences

and unsupported speculation. *Id.* at 759 (citation and internal quotations omitted).

Here, it is the defendant's evidence that is based on conclusory allegations.

Wyatt's contention in her affidavit that "there has been no employee who violated

the Safety Absolutes and who was not terminated" including two who did not pursue a workers' compensation claim is unsupported by any other evidence. Therefore Wyatt's own self-serving and conclusory assertions are insufficient to counter the strength of the plaintiff's prima facie case.

The plaintiff also believes she was terminated for filing a workers' compensation claim because she was injured before on the job, did not file a workers' compensation claim and was not terminated. (J.A. p. 69-71).

In addition, Grannan's investigative report lacks credibility. First of all, he re-enacted the manner of injury himself even though the plaintiff was present to show him exactly how the injury occurred. Likewise, he took photographs of himself to depict the injury when he clearly could have taken photographs of the plaintiff re-enacting the injury. Second, all decisions related to the plaintiff's termination were based on Grannan's faulty investigation. Third, there were no witnesses to the injury and the plaintiff never admitted to reaching into a moving machine. Finally, GPI admitted that the plaintiff was injured on the job, and work was available which would have accommodated her one arm work restriction. Yet by terminating the plaintiff, GPI avoided having to bear the inconvenience of accommodating the plaintiff's physical restrictions and did not have to pay the plaintiff's expensive medical bills. (J.A. p. 115).

27

The fact that the plaintiff cannot prove her case with direct evidence is not unusual. Because the courts recognize that such "smoking guns" are relatively rare, the plaintiff may prove that the forbidden animus was a motivating factor through presentation of either "direct" or "circumstantial" evidence. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). And, contrary to the defendant's contention regarding other employees who were not terminated for filing workers' compensation claims, the plaintiff is not required to prove a pattern of discrimination. Rather, she merely has to forecast evidence that the employer retaliated against ***her*** in violation of REDA. In *Brooks v. Stroh Brewery Co.*, 95 N.C. App. 226, 237, 382 S.E.2d 874, 882, *disc. review denied*, 325 N.C. 704, 388 S.E.2d 449 (1989), the Court stated that it "is not unmindful that circumstantial evidence is often the only evidence available to show retaliation against protected activity."

Based on the foregoing, the circumstantial evidence produced by the plaintiff was strong enough to withstand the defendant's motion for summary judgment. A reasonable jury could render a verdict in favor of the plaintiff under these facts, especially if it determines the defendant cannot prove its burden by a preponderance of the evidence.

## <u>CONCLUSION</u>

Because the plaintiff has established a prima facie case and the defendant has a burden of proof under NCGS §95-241 ("REDA"), the Defendant's motion for summary judgment should not have been granted. Therefore, the District Court's order should be REVERSED.

## <u>REQUEST FOR ORAL ARGUMENT</u>

The Plaintiff-Appellant respectfully requests that the Court allow Oral Argument since the dispositive issues herein have not been authoritatively decided by this Court, and since this is a case of first impression.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-1363            Caption:  Cynthia Joyce Sledge vs. Graphic Packaging Int'l, Inc.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]  this brief contains _____6,084_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]  this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓]  this brief has been prepared in a proportionally spaced typeface using MicroSoft Word _____ [*identify word processing program*] in Times New Roman 14 _____ [*identify font size and type style*]; **or**

   [ ]  this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Angela Gray _____

Attorney for Plaintiff-Appellant _____

Dated: 05/27/2014 _____

# CERTIFICATE OF SERVICE

I certify that on  <u>05/27/2014</u>         the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mason Alexander
Fisher & Phillips, LLP
P.O. Box 36775
Charlotte, NC  28236
malexander@laborlawyers.com

/s/ Angela Gray
_____
Signature

05/27/2014
_____
Date